May it please the Court. My name is Nelson Ebal. I'm the attorney for Kingsley Wonguma. This afternoon I intend to address three issues. First, the sufficiency of the evidence. Second, the abuse of trust enhancement. And third, the confrontation clause argument. As to the Wonguma was not qualified to diagnose. He only received quote-unquote marching orders from the doctors and from the RNs. Significantly, the doctors and the RNs that played guilty, for instance, Dr. Claudio and patients Okoroji, they made false representations not only to Medicare, but also to Nalwonguma. Whenever he received a plan of care from the doctor and from the RN, that plan of care certified not only to, certified to Medicare that the diagnosis that they made were accurate. And Mr. Nalwonguma relied on them just like Medicare did. And then third, it's really important to note that none of the government's witnesses at trial testified that they agreed with Nalwonguma to commit health care fraud. For instance, when Sean Chamberlain testified, he didn't even mention Mr. Nalwonguma's name even once. And then when Usami Ewa testified, he didn't implicate Nalwonguma at all. Instead, he just testified that he was a judge. He asked Nalwonguma, what's going on here? And then Mr. Ewa never even elaborated. So there's no direct testimony from any of the government witnesses at trial. This case is very analogous to the facts in this court's decision, the United States versus Ganji, which was issued last year. In the United States versus Ganji, the two defendants there, this court found that there was insufficient evidence to support their convictions. One of the defendants in that case, Elaine Davis, like Nalwonguma, was not qualified to make any diagnosis. After all, she was just an accountant. But this defendant in Ganji, Elaine Davis, she actually paid bonuses to some of her employees for bringing in patients to the home health care agency that she managed. So you have a fact very similar to what Nalwonguma was participating in this case. And then also, in the Ganji case, significantly, Elaine Davis, she never got noticed that the patients were not homebound. Likewise, in this case, Mr. Nalwonguma never got noticed that the patients were not homebound. Instead, he got the opposite. Like I said earlier, he was being told by Dr. Claudio and patients Okoroji and other folks that these patients that he was working with were, in fact, homebound. And then, significantly, in the Ganji case, at one point— Sir, do you need some water? Would you like some water? We can get you some. I apologize. I'll get some water. I'm recovering from a sinus infection. I just thought I'd help you a little bit. In the Ganji case, Elaine Davis, she also asked one of the doctors, after he had been indicted, to actually come in and sign some paperwork. And this court noted that even though Elaine Davis may have been on notice that there was something criminal afoot, that that did not amount to proof beyond reasonable doubt that she knew that there may have told Nalwonguma to say that he spent 45 minutes with patients instead of 50 minutes. Excuse me. That does not mean that Mr. Nalwonguma knew from that statement from patients Okoroji that there was something more than just some criminal activity afoot. In the Ganji case, there were also lax practices. For instance, Dr. Ganji, she apparently was not keeping her files in order. Likewise, here, Mr. Nalwonguma, he admittedly was negligent in keeping his notes in order. But as this court stated in the Ganji case, patient negligence, keeping subpar files, and haphazardly conducting business, those are not a basis to find beyond reasonable doubt that someone conspired to defraud Medicare. As to the abuse of trust enhancement, it's important to know that Mr. Nalwonguma had no professional discretion. After all, it's undisputed that the Plain of Care just served as his marching orders. On top of that, he had no managerial discretion. He didn't supervise anybody. And for these reasons, the abuse of trust enhancement was inappropriate. As to the conference— I just want to make sure before you sit down, and I'm sure you'll get a little extra time to do it if you need it—I wanted you to talk to me about Mr. Nalwonguma's appeal of the notice of the special supervised release condition. I don't know if you were intending on addressing that issue or not. I would be happy to. Just briefly. Sure. There is a document that he signed where he acknowledged a special condition, but it's not timestamped, so we don't know if it was signed before or after the sentencing hearing. In addition, the transcript itself has no timestamp identifying when it started, when it ended. So for those reasons, there's an ambiguity. Because there's an ambiguity, that special condition should be vacant. Was it not in the PSR? Do you know? I don't believe it was in the PSR. I'm happy to submit the letter if necessary. Thank you, Your Honors. May it please the Court. My name is Niles Illick, and I represent Dr. Kelly Robinet. Dr. Robinet and I appreciate the additional time the Court has granted us today for oral argument, but due to the necessary time constraints, we plan to only address our first and third issues, issue one being legal sufficiency and issue two being the jury charge error. In our first issue, we contend that the evidence was legally insufficient to support the conviction against Dr. Robinet for conspiracy to commit health care fraud and for health care fraud. To carry its burden, the government had to show that Dr. Robinet entered into agreement to defraud the government or that he knowingly or willingly executed a fraudulent scheme. The government can, of course, rely on circumstantial evidence, but it cannot rely on mere similarity of conduct, nor can it rely on speculation, surmise, conjecture, or attenuated inference stacking. The government is right in at least one respect, in my opinion, on page 30 of their brief that the evidence for the other defendants in this case for committing Medicare fraud is fairly strong, but as the government acknowledges on page 30 of their brief, that evidence is considerably more attenuated when it comes to Dr. Robinet. To carry its burden, government has asked this Court to consider three arguments. They should all fail. First, the government asked this Court to consider that Dr. Robinet knew that he had to follow the Medicare rules. Well, that seems obvious to me. The question here is whether Dr. Robinet knew that the Medicare rules were not being followed. He went in and investigated them, and did he then enter into willingly and knowingly a fraudulent scheme? For this reason, the government's argument doesn't stand. The government's first argument doesn't stand. Second, the government asked the Court to consider that Dr. Robinet knew that he had to follow the Medicare rules. He went in and investigated    them. The third argument is that Dr. Robinet, first of all, came in after these people had been on for a long time. His job was to review the 485s and see whether these people belonged on home health care, and when you look at those 485s, you see that these people suffered things such as difficulty breathing, difficulty with ambulation, incontinence, and I'm conglomerating the different people into one list here, but problems with balance, dizziness, lack of coordination, and daily pain levels of four, five, and six, depending on who you were talking about. If believed, these are legitimate reasons to be on home health care, and we can look to that from the testimony of Lisa Garcia, the government's witness, who said, and I'm referring to pages, say, record on appeal 1348 through, say, 1380, where she says home health care is appropriate if it's difficult to get out of the house. It means that you can go to church. It means that you can go get your hair done, but it's difficult. It's difficult to leave the house, and she also said that Dr. Robinet didn't have to see these people. He could rely on what was given to him, so when you look at what Dr. Robinet was given in these files, difficulty breathing, difficulty with ambulation, incontinence, all these problems these people had, they're legitimate reasons to be on home health care. Finally, the government asks us to, asks this court to consider deliberate ignorance, and I will discuss deliberate ignorance and the propriety of it in the jury charge in just a moment, but if we can assume for a moment, we can dispense with the argument of whether it's proper or not and assume that it is. It again relies on an improper inference or an improper speculation in order to reach the conclusion. It's certainly true that Dr. Robinet, and I think Dr. Robinet would be the first one to agree, that he should have been more involved in this practice. He should have been watching what was going on more closely, but what he was engaged in was really professional negligence. He was a lax doctor, a poor doctor, a person who was tired of being a doctor. He didn't enter, he had at this point in his life about a million dollars, 5,000 shares of Apple stock. He lived a modest life. He didn't need the $1,500 or $2,000 he got a month from this. This wasn't some big windfall for Dr. Robinet. This was a rather small, modest monthly income for which he thought he was doing, you know, the appropriate amount of work. For these reasons, the evidence was insufficient to support the verdict. We ask that the verdict be reversed and the judgment enter of acquittal for Dr. Robinet. Turning quickly to our third argument, we contend that the district court erred in granting the government's request for deliberate ignorance instruction. This analysis starts with the oft-repeated missive that the deliberate ignorance instruction should rarely be given, but with the acknowledgement that more and more it is being given in cases such as this one. But to get to the instruction, there must be evidence that Dr. Robinet was subjectively aware of a high probability of the existence of illegal conduct and that he purposely contrived to avoid learning of that illegal conduct. In deciding to issue this, the district court relied on the Gibson case out of this court. Gibson involved four defendants. In Gibson 3, the court numbered them Gibson 1, 2, and 3. Gibson 3 was the defendant appellant who objected to and then raised the issue of deliberate ignorance on appeal. But Gibson 3 in this court found that the deliberate ignorance instruction was appropriate. But Gibson 3 was deeply involved in the fraud in the way that Dr. Robinet certainly was not. Gibson 3 kept records of all of the patients. He kept records of all of the marketing and he specifically told everyone, I don't want to know where these patients came from. Do not tell me where these patients came from to build this facade or charade of ignorance. Here, Dr. Robinet reviewed files and early on he made files in 485s. Early on he made corrections to them and I think you'll see that at page 1945 of the record. And then certainly later on he reviewed them less and less and less and part of that may have, we don't know why that was. We don't know, the evidence doesn't tell us. They don't tell us whether they were getting better and they didn't need correction, whether his alcoholism interfered and he quit doing it or whether he was just being a bad doctor. In its brief, the government fails to point to evidence to show that Dr. Robinet was subjectively aware of the high probability of illegal conduct. It's true that Dr. Robinet looked into home health care before he got involved in this and government makes some points about that on page 51 of their brief and Dr. Robinet did it because he understood there was a problem with fraud in home health care. But what the government has failed to do in its brief is distinguish the general from the specific. That Dr. Robinet understood that there was a problem with fraud in home health care doesn't mean that he was subjectively aware that there was a problem with this particular home health care program that he was involved in. So he looked into it, he made an investigation, but we don't know what, we don't know, we don't have any evidence to show that there was a high probability of fraud in this particular case. No evidence. So we have the general evidence that there's fraud in this area but no evidence that it occurred here, certainly not with Dr. Robinet. Instead, at worst, the evidence shows that Dr. Robinet wasn't acting as a good doctor and was usually or often professionally negligent. Further, there's no real evidence, there is no evidence that Dr. Robinet sought to avoid learning of the fraud. It's true that he didn't look at the files sometimes, that's true, but there is no evidence that Dr. Robinet sought to avoid learning of the illegal conduct. Well, couldn't that be, couldn't a jury find that was based on the fact he wouldn't look at the files? Well, I think, I mean, it's a jury question. Yes, well, Judge Barksdale, I disagree with you and here's why, because I don't think the evidence explains why he didn't look at it. So we know at the beginning, and I think you can look to page 1945 on the record, that he is looking at them, he's making some corrections, he's changing them. The question then is, why did he stop looking at them? Was it because he was an alcoholic and he was drunk all the time? I don't know, I don't even know if that's true. That's one explanation. Another one might have been that he was trying to avoid learning about a fraud. Another might have been that the records had been getting better, and there's just no evidence in the record that allows us to know which one of those it is. So it requires this impermissible, excuse me, I've gone over my time, if you don't mind me finishing. No, sir. It requires this impermissible inference or speculation to conclude that it was an effort to avoid learning of illegal conduct. I see I've run out of time. Thank you for the additional time this morning. Good afternoon. May it please the court, my name is Kevin Ross. I am a CJA appointed counsel for Ms. Joy Ogwugu in this case. The issue that I'm going to address with the court is our first issue, which is whether the evidence is sufficient to support Ms. Ogwugu's convictions in counts 2, 3, 5, and 6 for health care fraud. And the argument specifically goes to whether the evidence shows that she had the requisite knowledge and intent to defraud. What we know from the testimony of Ms. Ogwugu is that they were the owners of Timely. And we also know through the testimony of Ewall that Ewall was the one who taught Ms. Ogwugu how to fill out, how to process the paperwork in this case. She was mainly hired as an office admin person to do the administrative paperwork in this case. At times, did she go out and see clients, and she did at times. But mainly her function was to fill out that paperwork that Ewall had taught her how to do. Now, the question becomes, did Ms. Ogwugu's actions, and what the government will point to is that there is specific paperwork which clearly shows that what she signed off on or dates that she put into did not happen. And so the government's position is, those documents on its face show that she was participating in knowingly falsifying documents. The question though becomes, does that suffice to go further to show that she had the specific intent and knowledge and we would submit that it is not. She was told what to do and how to do it when she fulfilled those job obligations. Now, interestingly, Ms. Ogwugu was charged in the conspiracy count, but she was acquitted of the conspiracy count. And I know that the elements are different from conspiracy to commit healthcare fraud as to the substantive counts of committing healthcare fraud. But what's interesting is that the jury heard testimony that Mr. Ewall and Okorogi taught her how to do this paperwork. And yet the jury found that Ms. Ogwugu was not engaged in an unlawful activity. The jury didn't find that as to Ms. Ogwugu. And so it's to say that the reason that supports Ms. Ogwugu's convictions for these counts is because just this paperwork, it doesn't go far enough to show that she actually had the willfulness, the knowledge, and the specific intent to defraud and to participate in a scheme to defraud. Again, a verdict can't rest on that mere speculation or piling inference upon inference. And that's what we have in this case. We have piling on of inference upon inference in speculation. When Mr. Ewall testified, he did not specifically say that he had told Ms. Ogwugu of the scheme or the fraud or how they were defrauding Medicare. There was no indication of that at all. She worked there for a very short period of time. She even at one point brought to the attention of the owners at TimeLink that a person she didn't believe needed to still be on Medicare. That shows not somebody who's intending to defraud Medicare. That shows somebody who is stating a reason that this person shouldn't be on anymore. If she was intending to defraud, she would have never brought that to the attention of the owners at TimeLink. So there lies another support of evidence that she did not have the specific intent to defraud. The question becomes, did she aid and abet in the scheme on the substantive accounts of health care fraud? I would submit that the answer to that is no. To be an aider and abetter, you have to have the specific intent as the principal, which I think the evidence establishes that Ms. Ogwugu did not have that same intent as the co-conspirators and those who were convicted in this case. She's not an aider and abetter. She didn't associate with the criminal venture. Willfully participate in it and by her actions to make that venture successful. That was not her intent and there's no evidence in this case that she had that specific intent. And for that reason, her convictions should not stand and they should be reversed. We cited in our brief a 10th Circuit case, Rufay, which stated and held that it reversed a health care fraud conviction and it reasoned that the issue is not whether the defendant's actions aided the fraud, but whether he knew he was doing so, aiding the fraud. There's no evidence in this aiding to defraud Medicare. It's not there. We also cite Jones, another 10th Circuit case where we are arguing that the defendant may not stumble into aiding and abetting and liability by inadvertently helping another in a criminal scheme unknown to the defendant. The evidence is not present in this case that shows that Ms. Agawugu specifically intended to defraud Medicare and the co-conspirators who are co-defendants in this case who testified at no time gave any evidence specific to the fact that she knew that there was a scheme. She knew that there was what was going on in regards to these paperwork being submitted to Medicare for purposes of defrauding them. And for those reasons, we asked the court to reverse her convictions and then the other issues that we have, we would rely on the briefing in this case. May it please the court, Fenula Tessier on behalf of the United States. I would just like to address some of the arguments that defendants have raised in their presentation today. First, as to Mr. Nwanguma, his argument as to the sufficiency of the evidence is really twofold. First, he argues that because he was not able to give a medical diagnosis, he could not defraud Medicare. That, of course, overlooks the fact that there was testimony at trial that his job as a licensed vocational nurse was to visit the patients and to report back when the patients were no longer in need of care or if care was not accomplishing its goals. It also overlooks the fact that one did not need to be a doctor in order to know that these patients were not homebound. I think the jury could tell that from the patients who themselves testified about walking two miles a day, taking care of great-grandchildren, mowing the lawn, driving cars, visiting their primary care physicians at their primary care physician's offices. He also argues that the lack of direct testimony means that he could not have been convicted, but that argument overlooks his own admissions. He admitted that he agreed with patients Okorochi that in return for more pay per patient visit that he would do whatever she wanted him to do, and he admitted that he lied about the amount of time that he spent with patients in order to be able to bill Medicare more. Now, he argues in his reply brief that that time period was never submitted to Medicare and was not included in the Medicare claims, but it was an important part of the nursing notes that Mr. Nwanguma was required to keep as a licensed vocational nurse. In particular, on those nursing notes, and we've pointed the court to a number of them in our brief, in those nursing notes he put in the time in and time out. If you look to page 21,769 of the Record on Appeal, this is a visit with patient BH, and it says arrive time 8.04 a.m. to part time 8.55 a.m. Mr. Nwanguma understood that if he was actually providing skilled nursing services that he would have been spending 50 minutes with a patient, but because all he was doing was checking their vital signs, which is not something for which Medicare pays for home health services, only spending 15 minutes doing check and vital signs with the patients, that that he was not, in fact, providing skilled nursing services. As to the abuse of the position of trust argument, Mr. Nwanguma argues that he had no professional discretion, but he... Can I stop you there, Counsel? Yes. I think it was with reference to this point that Mr. Nwanguma's counsel relied pretty heavily on United States v. Ganji. Yes, Your Honor. And argued that his client is similar to the defendant Davis in that case. What's your view? Certainly. Well, as I understand, Ms. Davis in that case was an accountant. She was not a medical professional, and so she was not charged with visiting the patients and actually providing the skilled services and reporting back to her supervisor whether or not the patient needs skilled services. That was precisely Mr. Nwanguma's job, and so that in and of itself is enough to distinguish patient or Ms. Davis in the Ganji case. As to the abuse of position of trust, he, Mr. Nwanguma, did have professional discretion as a licensed medical professional to visit the patients, provide them with care, and report back to his supervisors if they no longer needed it. And he argues that he had no managerial supervisory authority, but that's not required for the abuse of position of trust enhancement. One question that, Judge Duncan, you had about the supervised release condition. It was not included in the PSR. Okay, so it wasn't in the PSR. So the issue is, did he have adequate notice? What the government did, I may be getting this wrong, the government did concede with respect to Nwanguma. That's correct, Your Honor. That's correct, Your Honor. The sentence has to be reformed or remanded on that point, but are you not conceding with respect to Nwanguma? That's correct, Your Honor. There's one significant difference between those two defendants. Mr. Nwanguma, on the docket for the case, there is an order from the court with a list of special supervised release conditions. It is dated the same day as the sentencing. As counsel, Mr. Nwanguma points out, there's not a time stamp on it, but it is signed by Mr. Nwanguma and it is the day of sentencing. I think the court can reasonably infer from that that he received notice of the special supervised release condition, which would then trigger plain error review. How do we know it was not received after the oral pronouncement? We do not know whether it was received before or after the oral pronouncement. It may make a difference on the ultimate question if it's under abuse of discretion standard. I think our position is that as to the initial question of what is the standard of review, then he would have had an opportunity to object at the point at which he has been asked to sign the document, and he signed the document without objecting to it. But if he'd signed it after oral sentencing, there could be a conflict between the oral sentence and what he signed after oral sentencing. There's two separate questions. One is what is the standard of review, and one is whether or not it's an abuse of discretion. I think that our argument is that the presentation to him of the written document means that he had an opportunity to object, which means that it's under plain error review. And I'm not aware of a case in which this court has found a conflict between the oral pronouncement and the written judgment where the defendant on the day of sentencing was given a written document. And so under the plain error standard of review, he wouldn't be able to establish plain error. Is it his burden to establish that he received it after the oral sentencing? That's an excellent question, Your Honor. I don't believe the case law speaks to that. I suppose the question is, whose burden is it to show that the issue has been preserved? Because that's what the written notice gets to, is whether or not he has had the opportunity to preserve this. And so I think the answer to that would be it depends on who bears the burden of showing that the issue has been preserved. And I think as appellant, he would bear that burden, but I will admit that I'm not thinking of a particular case that would establish that. That's just sort of a logical analysis. The worst case scenario for you on that issue on the standard of review is it's abuse of discretion, not plain error? That's correct, Your Honor. So if it's abuse of discretion, you still win? I think that is harder for us to win on because this court has a lot of cases saying that if there's a conflict between the oral pronouncement and the written judgment that the oral pronouncement is the one that's going to win. So I think if there had not been the written document, as you can see from our position with respect to Ms. Oguegbu, without the written documents, we would have confessed error on this issue and agreed that it should go back. Moving on to Mr. Robinet's arguments. His argument on the sufficiency of the evidence is essentially that if you look at the forms that he was filling out, this was these two to three page form 45s, that it looks like the patients need services. And he may have some argument on the very surface of those documents, but I'd encourage the court to actually look at those documents and go through them because you'll see that they were unchanging over time. The documents that he signed for patients SS and LS, for example, said that they had started to sign on the documents he was signing and were still receiving services for many years later, with treatment goals being such as learning how to identify high sodium foods. There was identical information, not just across time for particular patients, but across particular patients. At 1756 and 57 of the record in the trial transcript, there's a discussion of telephone orders for LS and SS where they're given identical treatment plans on identical dates. The treatment plans were also very similar, not just for the married couple, but for patient BH. Many of the same information that's contained in the forms for LS and SS contained for BH. They all had to, the treatment plan, or one of the goals of the treatment plan was to get them to identify high sodium foods, for example. So even on their face, those documents, it should have been obvious that they were not accurately reflecting the patient's condition or that the patients did not need the home health care services. The telephone orders were also false on their face. Mr. Robinette himself admitted that he knew that almost all of Boomer's patients were coming from home health care agencies, not the other way around. And the Dr. Robinette was reaching out to the home health agency in order to get services for their patients. And he knew that that was not true. But in any event, the evidence of his deliberate ignorance was overwhelming. First as to his knowledge, his actual knowledge of a high probability of illegal conduct. Of course, we pointed to his own statements that he investigated home health care precisely because he knew about arrests and fraud in the industry. But specific to this case, he also agreed to be the owner of Boomer home health visits on paper only for a legal requirement. And he agreed to be the supervisor of Sean Chamberlain, even though he himself only viewed himself as a hired hand. He also purposefully contrived to avoid learning of fraud, even though his job as the doctor was to be the gatekeeper of the patient's care. He was required to always be available by phone when his physician's assistant was visiting the patients. He never visited the patients or read their files. He rarely asked questions. Mr. Chamberlain testified towards the end he never asked any questions about the plan 485s. And he continued to sign forms when he was in inpatient treatment and was not available by phone to consult with Mr. Chamberlain. Also, even though he was the owner of Boomer, he never sought access to the bank accounts or to the Medicare billings and professed surprise at the amount of money that had been billed by Boomer to Medicare. Finally, as to Ms. Oguegbu's sufficiency argument, and I'm sorry, I should note that, of course, that overwhelming evidence of deliberate ignorance establishes why the judge did not err in giving the deliberate ignorance instruction. Finally, as to Ms. Oguegbu, she argues that she was essentially an office admin. Well, that's not what the evidence shows. The evidence shows that she was the director of nursing. She received two separate checks. One was for functioning as the director of nursing, responsible for all the nurses underneath her, and the other one was for doing the OASIS assessments necessary in order to be able to bill Medicare for home health services. Again, I'd encourage the court to actually look at some of the medical files here that we have cited. In particular, if you look at for patient W.L., pages of the record 9714, 9684, and 9651, these all have to do with the charged period for patient W.L. If you look at those forms, you'll see what Ms. Oguegbu is filling out. Her OASIS form, which if you look at it, it's an in-person, supposed to be a one to three-hour assessment of the patient and whether or not they need services. At the bottom on page 9714, it has the RN signature with Ms. Oguegbu's signed RN, the date of the visit, the time in and the time out, in 10 a.m., out at 11 a.m. She didn't go in at 10 a.m. and she didn't come out at 11 a.m. because as patient W.L. testified, she never visited him. Page 9684 is a home health aid supervisory field visit for that same certification period. It is, again, an in-person assessment, asks whether or not the health aid is present, and the health aid was not present, so that is Ms. Oguegbu filling this out. She has the evaluator signature, and it's a supervisory field visit. She was supposed to be with patient W.L. She was not. And then the telephone order at 9651 for the same time period. Again, these are the same telephone orders that Dr. Robinet knowingly signed that were false on their face, that indicated that the referral was coming from the doctor when, in fact, it was coming from Timeline. From this evidence, the jury could, of course, reasonably infer that Ms. Oguegbu knew exactly what she was doing. I'll note her filling out OASIS forms without visiting the patients was so concerning to even Mr. Yuwa, who himself admitted that he put fake information on forms and that he willingly certified patients for care, knowing that they didn't need it. It was so concerning to even him that he raised this issue with patients' Okorochi. And yes, she continued to fill out forms for patients, never having visited them, in her own words, just transposing data from one form to another. That was more than sufficient evidence from which the jury could infer her guilt. Of course, she was the one that was convicted of Medicare fraud, but acquitted of conspiracy for Medicare fraud. That's correct. Did you participate in the trial? I did not, Your Honor. But you're very versed in this record. Yes, Your Honor. And if you could just give an opinion as to why you think the jury convicted on one and acquitted on the other. You know, when you're convicted on one and acquitted on another, it's sort of a two-edged sword. You know, you can argue both ways. Well, that shows it was a careful jury, or that shows, well, you shouldn't have been convicted on the subject. Just on your analysis of the evidence, what do you think was maybe a basis for the verdict? Of course, Your Honor. And of course, we don't know exactly what the jury was thinking. And of course, Your Honor has referred to the case law, this court's case in Thomas, the Supreme Court case in Powell, saying that you can't read anything into inconsistent verdicts. But I do think that there are two possible things that were going on, just having read the record cold. First of all, the other defendants were each charged on four counts, one count of conspiracy and three counts of substantive fraud. Ms. Agwegu was charged on five counts just as the indictment came out, one count of conspiracy and four counts of fraud. So as the jury returned their verdict, each one of the defendants received four counts of conviction. So it may be that the jury thought that there was some import to that. I also think that there was some difference in the direct evidence of conspiracy here. The jury may have been under the impression that it was that evidence for Dr. Robinet came primarily in the form of the testimony from Sean Chamberlain, who testified that Dr. Robinet knew exactly what he was doing and that he agreed to become the owner of Boomer on paper only. For Mr. Nwanguma, that evidence probably came in the form of his own admissions, that he agreed with Patience Okoroji to do whatever she wanted in return for more money and that he knew he was lying about the amount of or that he lied about the amount of time spent with Patience to bill Medicare more. There's not a similar piece of direct evidence of agreement for Ms. Agwegu, and so it's possible that the jury thought that that was the piece of evidence they needed. Of course, a jury does not need direct evidence of conspiracy in order to convict. They can convict based on a concert of action, but if they were mistaken about that, that might explain it. If the court has no further questions, thank you. I'm going to respond to two points that were raised by the government. First of all, the government's expert witness did testify that a licensed vocational nurse is the one who goes out and sees the patient on a much more regular basis. It would be his or her responsibility to report back to his case manager anything that would indicate the patient is no longer appropriate for care. However, the government presented no evidence at trial that Nwanguma either did or did not do this, so we don't know. It's possible that this could have happened. There's so little testimony from Ewa and from Chamberlain, this could have happened. It's the government's burden of proof to show that he didn't go back and report to his supervisors, and the government failed to meet its burden of proof in that respect. Then also, with regard to the cane or not a cane and whether he could diagnose, there's undisputed testimony from the defendant's expert witness that Mr. Nwanguma could not make a diagnosis. On top of that, there's testimony, as I mentioned earlier, from the government's expert witness that the form 845 for the plan of care, those were the marching orders for Mr. Nwanguma. In the marching orders, for instance, for BH, the patient with the initials BH, it said that BH had a principal diagnosis of arthritis and high blood pressure, and it also said in the plan of care that activities permitted for BH were up to tolerate. So if, for instance, BH was out walking around with arthritis, that was fine according to the doctors and the RNs. So there is nothing out of the ordinary that Nwanguma would have to report in that instance. And then also significantly, I just want to highlight in the plan of care, it orders Mr. Nwanguma to go out there and give SN, which I assume means skilled nursing, to assess and evaluate all body systems and perform vital signs every visit. So it's not surprising that Mr. Nwanguma went out there and was weighing the patients and taking their temperature on each visit. For these reasons and all the reasons that I stated earlier for those stated in the brief, there's just simply insufficient evidence to convict Mr. Nwanguma for conspiracy. Thank you for your time today. If it pleases the court, I'm willing to yield back my time to the court unless the court has any additional questions and rely upon our briefing in this case on these matters. We want to recognize that each of the defense counsel was court appointed. We very much appreciate your willing to take these cases and you've done an excellent job for your clients. Thank you.